ROZETTA MIZELL

VERSUS

JUSTON STONE

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 244913
HONORABLE THOMAS M. YEAGER, DISTRICT JUDGE

**********

**JIMMIE C. PETERS**
**JUDGE**

**********

Court composed of Jimmie C. Peters, Billy H. Ezell, and Shannon J. Gremillion, Judges.

**REVERSED AND RENDERED.**

GREMILLION, J. concurs and assigns written reasons.

**Michael H. Davis**
**2017 MacArthur Drive, Building 4, Suite A**
**Alexandria, LA 71301**
**(318) 445-3621**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Rozetta Mizell**

**David C. Hesser**
**Hesser & Flynn, A Limited Liability Partnership**
**2820 Jackson Street**
**Alexandria, LA 71301**
**(318) 542-4102**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Juston Stone**

**PETERS, J.**

Rozetta Mizell appeals the trial court's judgment removing her as domiciliary custodian of her minor child and awarding that status to the child's father, Juston Stone. For the following reasons, we reverse the decision of the trial court and render judgment reinstating Ms. Mizell as the domiciliary custodian.

## DISCUSSION OF THE RECORD

Ms. Mizell[1] and Mr. Stone are the parents of Teaci Trinity Berlin Stone-Mizell (hereinafter referred to as "Teaci"), who was born in Las Vegas, Nevada, on March 10, 2008. The litigation in this state began on June 22, 2012, when Ms. Mizell, who by then was living in Rapides Parish, Louisiana, filed a petition in the trial court seeking to have a judgment rendered by a court in the State of Nevada recognized and made a judgment of the trial court. In the same pleading, Ms. Mizell sought modification of the custody, support, and visitation provisions of the Nevada judgment.

Ms. Mizell filed this petition in compliance with an order of the Family Division of the Eighth Judicial District Court of Clark County, Nevada, dated June 5, 2012. The Nevada order arose from an effort by Mr. Stone to bring a rule to change custody in that court in early June of 2012. The minutes of the Nevada court dated June 5, 2012, reflect that court's dismissal of Mr. Stone's custody rule on jurisdictional grounds after finding that Ms. Mizell resided in Louisiana and that Mr. Stone resided in Georgia. The minutes reflected the following disposition of the matter:

> COURT FINDS, this Court does not have JURISDICTION as neither party resides in the state of Nevada.

---

[1] Subsequent to the filing of the initial pleading giving rise to the Louisiana phase of this litigation, Ms. Mizell married Roy Mancil. However, for the sake of consistency, we will refer to her as "Ms. Mizell" throughout the opinion.

COURT ORDERED, Defendant shall FILE an action in the state of Louisiana or in the Child's home state within the next thirty (30) days. This case is DISMISSED with prejudice.

Ms. Mizell attached two judgments to her June 20, 2012 petition: (1) the original decree of the Family Division of the Eighth Judicial District Court of Clark County, Nevada, dated July 9, 2008, and purporting to establish the custody, support, and visitation parameters for that point in time; and (2) a July 21, 2010 order of that same Nevada court modifying the visitation schedule established in the July 9, 2008 judgment. Mr. Stone initially responded to this pleading by filing declinatory exceptions of lack of subject matter jurisdiction and lack of personal jurisdiction. In pleading his exceptions, Mr. Stone asserted that he filed a petition for change of custody in Georgia on June 13, 2012, at a time when Teaci was physically in Georgia and temporarily in his custody.

The trial court heard the exceptions on August 22, 2012, and took the issues under advisement. On October 9, 2012, the trial court issued written reasons for judgment rejecting both exceptions. In those written reasons, the trial court recognized Nevada's rejection of jurisdiction over the proceedings and rejected Mr. Stone's argument that his temporary custody of Teaci gave Georgia jurisdiction over the proceedings. The trial court executed a judgment to that effect the same day. Mr. Stone responded to the judgment by filing a motion seeking clarification of certain aspects of the trial court's judgment.

The trial court scheduled all pending matters for a pretrial conference on November 26, 2012, and during the pretrial conference, the litigants reached a stipulation pending further proceedings. The trial court reduced the stipulation to an interim consent judgment, and in doing so, made the Nevada judgments

2

executory in Louisiana,[2] and effected an immediate modification of the support and visitation aspects of the Nevada judgment on an interim basis, with the following language:

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that considering the lack of minimum contacts by Juston Stone with Louisiana that Louisiana shall not now or in the future modify child support and any such child support modification shall be sent to Georgia or the state of Juston Stone's domicile;

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the parties, Juston Stone and Rozetta Mizell, shall have interim joint custody of the minor child, Teaci Trinity Berlin Stone-Mizell, and Rozetta Mizell shall be the interim domiciliary parent subject to the custodial periods by Juston Stone;

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Juston Stone shall have his custodial periods as set forth in the prior Nevada Judgment signed July 20, 2010; The Nevada Judgment is understood to mean that school begins when the minor child starts pre-kindergarten; Juston Stone shall have the physical custody of the minor child for the Christmas school vacation from noon on December 22, 2012 until January 5, 2013 at noon;

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the parties are to meet to exchange the minor child in Mobil [sic], Alabama;

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the parties are to exchange and have full access to all of the school and related activities of the child;

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the parties are to let the other parent know of the people watching the minor child;

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the prior telephone communications with the minor child in the Nevada Judgment of July 19, 2012[3] are still in effect[.]

---

[2] The stipulated interim judgment references only the July 21, 2010 order and attaches a copy of that order to the interim judgment. However, both the litigants and the trial court have consistently referenced the original July 9, 2008 consent judgment as though it had been made executory, and the July 21, 2010 order provides that "any and all other provisions of the prior Decree that have not been altered by this Ordered [sic] remain in full effect." Based on that consistency of the evidentiary record, we conclude that the reference in the stipulated interim judgment intended to include the original Nevada judgment by reference.

[3] The source of this date is unclear, and we must assume that it is a typographical error, which intends to reference the July 2010 order.

The remainder of the interim judgment addressed discovery issues and access to individual internet passwords; and ordered the litigants, their spouses, and Teaci to undergo mental health evaluations with Dr. John Simoneaux, a Pineville, Louisiana forensic psychologist.[4]

The parties complied with the order for the mental health evaluations; and based on his interpretation of Dr. Simoneaux's written findings, Mr. Stone filed his own rule seeking to have the domiciliary custodian arrangement changed to have him named as Teaci's domiciliary custodian. The competing custody claims went to trial on March 28, 2014, and after completion of the evidentiary phase of the trial, the trial court took the matter under advisement. On June 13, 2014, the trial court issued written reasons for judgment, finding in favor of Mr. Stone on the custody issue. After the trial court executed a judgment on September 19, 2014, giving both parents joint custody, but naming Mr. Stone as domiciliary custodian, Ms. Mizell perfected this appeal.

## OPINION

The evidentiary record establishes that at the time of Teaci's conception, Ms. Mizell and Mr. Stone were coworkers on a military base near Las Vegas, Nevada: Ms. Mizell as a member of the United States Air Force (Air Force), and Mr. Stone as a civilian consultant. Mr. Stone had previously been medically discharged from the Air Force based on a diagnosis of severe kidney stones and an Attention Deficit Hyperactivity Disorder. He then began working as a civilian consultant for the Air Force at the Nevada base.

When the sexual relationship began, Ms. Mizell was unmarried, while Mr. Stone was married to his current wife, MacKenzie Stone. However, the

---

[4] Through this point of the litigation, Judge John C. Davidson of the Ninth Judicial District Court presided. By the time of the trial on the merits, Judge Davidson had rotated to another division and was replaced by Judge Thomas M. Yeager.

4

relationship between Ms. Mizell and Mr. Stone was not the "normal affair," where a married man becomes involved with another woman without his spouse's knowledge. Instead, in this case, Mrs. Stone not only consented to Mr. Stone's sexual relationship with Ms. Mizell, she encouraged it. After a few months, Mrs. Stone withdrew her consent to the arrangement, but Mr. Stone continued seeing Ms. Mizell behind his wife's back.

Mr. Stone's relationship with Ms. Mizell lasted for approximately six to eight months, and both Ms. Mizell and Mrs. Stone became pregnant by Mr. Stone during that time period. Mrs. Stone's child was born approximately two months after Teaci and, according to Mr. Stone, he did not tell his wife that he had continued his sexual relationship with Ms. Mizell after she withdrew her consent, or that Teaci was his biological child, until around the time that Mrs. Stone gave birth.

The July 9, 2008 Nevada consent judgment[5] named Ms. Mizell as domiciliary custodian; set Mr. Stone's child support obligation at $400.00 per month, with reductions for periods he maintained extended custody rights; and ordered that an ultimate custody "time-share arrangement for the parties' minor child" be determined at a later date and "be as close to 50/50 as reasonably possible[.]" However, the judgment further set a very specific holiday schedule to be in effect regardless of the ultimate nature of the time-share arrangement.

The nature of the holiday schedule set by the Nevada court clearly contemplated that Ms. Mizell and Mr. Stone would live in close proximity to one another. However, Mr. Stone testified that two months before Teaci was born, he left Nevada for Tennessee. This change of domicile made the consent judgment,

---

[5] While the parties refer to the judgment as a consent judgment, it should be noted that Mr. Stone required genetic paternity testing in advance of giving his full concurrence. That being the case, evidence was accepted by the Nevada trial court on the issue of paternity before the judgment was rendered.

executed three months after Teaci's birth, unworkable from the start.

The various histories of Mr. Stone's travels after leaving Nevada are inconsistent. He testified that he remained in Tennessee for two years, and only returned to Nevada during that period to be present for the birth of his son.[6] According to Mr. Stone, when he informed his wife that Teaci was his biological child, she took their two children and left him. He testified that from Tennessee, he moved to Birmingham, Alabama, and while he resided there, he and his wife reconciled. At some point thereafter, Mr. Stone and his family moved to Valdosta, Georgia[7] where he was living when the Louisiana phase of this litigation began.

The trial court, in its reasons for judgment on the jurisdiction exceptions, noted that an affidavit provided by Mr. Stone in support of those exceptions stated that he "lived in Birmingham, Alabama when his child was born in March 2008. He moved to Clarksville, Tennessee in November 2008. From Clarksville, Tennessee, he moved to Valdosta, Georgia in March 2011 and has resided in Georgia since." Additionally, the time sequence in his testimony at the hearing of this matter is not completely accurate concerning his various moves. He testified that he remained in Tennessee for approximately two years, which would have caused his move to Alabama to occur in 2010. However, he informed Dr. Simoneaux on August 7, 2013, that he and his wife reconciled while he was in Alabama, and that he had been reconciled for five years at the time of his evaluation by Dr. Simoneaux.

Ms. Mizell was raised in Glenmora, Rapides Parish, Louisiana, and joined the Air Force after high school. After Mr. Stone moved to Tennessee, Ms. Mizell

---

[6] Apparently, the advanced stage of her pregnancy caused Mrs. Stone to remain in Nevada when her husband moved to Tennessee.

[7] The record does not establish when Mr. Stone moved to Georgia, but a copy of his Georgia driver's license introduced into evidence reflected September 27, 2011, as the date of issuance. Thus, he was in Georgia at least by that date.

remained stationed in Nevada where she was in the process of raising her daughter. However, by the time the matter giving rise to the July 21, 2010 order was considered by the trial court in Nevada, she had been transferred to an Air Force base in Alaska. She returned to Nevada for the proceeding resulting in the July 21, 2010 order, and Mr. Stone participated in the proceeding by telephone. Thus, neither Ms. Mizell nor Mr. Stone were domiciled in Nevada at the time of that hearing, a point obviously not mentioned to the Nevada court by either party.

During the first two years of Teaci's life, Mr. Stone had very little contact with his daughter,[8] and the July 21, 2010 order changed the original judgment only with respect to Mr. Stone's visitation schedule. It reads in pertinent part as follows:

> **THE COURT ORDERED:** That Juston Stone will have the minor child for six (6) weeks each summer starting the weekend after school ends. Prior to the minor child starting school the summer visitation will commence the last weekend in May.
>
> **THE COURT FURTHER ORDERED:** That before the minor child starts school Justin [sic] Stone will have visitation with the minor child all of December and April in even years. In odd years Justin [sic] Stone will have all of November and March. Visitation will commence by the first day of the month and the child will be returned by the first day in the next month.
>
> **THE COURT FURTHER ORDERED:** That after the minor child starts school Justin [sic] Stone will have the visitation with the minor child for the entire Christmas and New Year's Eve break and for spring/Easter Break in even years as dictated by the year Christmas falls on. In odd years Justin [sic] Stone will have the minor child for the entire Thanksgiving break and for spring/Easter Break in even years as dictated by the year Thanksgiving falls on.
>
> **THE COURT FURTHER ORDERED:** That the parties will equally split any and all travel expenses related to the minor child and will each be fully responsible for their own travel costs.

---

[8] Although at trial Mr. Stone complained of his lack of access to Teaci during this time period, he ultimately acknowledged that the tender age of the child and the distance between Tennessee and Alaska, and not Ms. Mizell's actions or inactions, were the stumbling blocks to his visitation.

**THE COURT FURTHER ORDERED:** That the receiving party will be responsible for transporting the minor child.

**THE COURT FURTHER ORDERED:** That Juston Stone will have the minor child for her birthday on odd years and even years with Rozetta Mizell.

**THE COURT FURTHER ORDERED:** That each party will provide the other party with written travel itineraries and contact information should they travel with the minor child out-of-state.

**THE COURT FURTHER ORDERED:** That each party shall be afforded telephonic contact with the minor child at approximately 6:30pm, dictated by the time zone the minor child is currently in. However, each party is admonished not to abuse this privilege, nor is it the order of this Court that the communication is intended to be daily. Rather this telephonic communication is intended to be a convenient time period for the parties to contact the minor child.

Given Teaci's age at the time of the order and the physical location of both parties, this order was no more realistic than the original judgment. Still, in his testimony, Mr. Stone expressed no complaints concerning his visitation privileges from that time until the trial now before us. According to Mr. Stone, the only disputes thereafter were over how and when to make the exchange.

Ms. Mizell and Teaci remained in Alaska until March of 2012. At that time, she received a medical discharge from the Air Force, and she and her daughter moved back home to Glenmora, Louisiana. Her discharge diagnosis was that of Bipolar II Disorder, non-combat related Post-Traumatic Stress Disorder (PTSD), and severe back pain. After returning to Louisiana, Ms. Mizell began dating Roy Mancil, whom she had known before joining the Air Force. She and Mr. Mancil were married on August 4, 2012.

### *Burden of Proof Issues*

Assuming no legal error interdicts the fact-finding process of the trial court, the burden a noncustodial parent must meet under Louisiana law to change a previously rendered custody judgment is well settled.

8

> When no evidence is adduced at the district court level prior to the entry of the joint custody order which is sought to be modified, that joint custody decree is not a "considered decree" within the meaning of *Bergeron* [*v. Bergeron*, 492 So.2d 1193 (La.1986)]. In this situation, the heavy burden of proof is not applicable, but the moving party must still prove a material change in circumstances since the entry of the original decree and that the modification proposed is in the best interest of the child. *McGee v. McGee*, 552 So.2d 576 (La.App. 2d Cir. 1989). Every child custody case must be decided based only on its own particular facts and circumstances. *Lindner v. Lindner*, 569 So.2d 173 (La.App. 1st Cir. 1990). On appellate review, the determination of the trial court in establishing or modifying custody is entitled to great weight and will not be disturbed absent a clear showing of an abuse of discretion. *Thompson v. Thompson*, 532 So.2d 101 (La.1988); *Bergeron*, supra.

*Beard v. Beard*, 599 So.2d 486, 488-89 (La.App. 3 Cir. 1992).

However, where a legal error occurs in the trial court's analysis, the discretion afforded the trial court in factual matters does not apply.

> [W]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights.

*Evans v. Lungrin*, 97-541, 97-577, pp. 6-7 (La. 2/6/98), 708 So.2d 731, 735 (citations omitted).

In its reasons for judgment, the trial court concluded that Nevada law applied to the custody issue; thus, Mr. Stone was only required to establish the "best interest" element in order to obtain the designation of domiciliary parent. On appeal, Ms. Mizell asserts that the trial court erred in applying Nevada law, rather than Louisiana law, to the custody dispute, and in doing so, it failed to require Mr. Stone to establish a material change of circumstances affecting Teaci's welfare. Thus, Ms. Mizell asserts that the trial court erred as a matter of law in reaching its decision.

9

Louisiana Code of Civil Procedure Article 1 provides that "[j]urisdiction is the legal power and authority of a court to hear and determine an action or proceeding involving the legal relations of the parties, and to grant the relief to which they are entitled." Jurisdiction can extend to a number of matters, including the subject matter of the dispute as provided in La.Code Civ.P. art. 2; the person as provide in La.Code Civ.P. art. 6; and the status of the parties as provided in La.Code Civ.P. art. 10. In fact, with regard to custody matters, La.Code Civ.P. art. 10(A)(5) provides that "[a] court which is otherwise competent under the laws of this state has jurisdiction of . . . [a] proceeding to obtain the legal custody of a minor if he is domiciled in, or is in, this state."

Mr. Stone does not question the jurisdiction of the trial court to determine the custody issue. Instead, he argues, as he did at the trial court, that Louisiana's jurisdiction is limited to the extent that it must apply Nevada's laws to the custody dispute and not the law of Louisiana. However, on appeal Mr. Stone does not cite to any authority for this argument. Instead, he argues that regardless of whether Nevada or Louisiana law applies, the trial court found that material changes of circumstances existed.[9]

On the other hand, Ms. Mizell directs this court to a number of decisions where Louisiana courts applied Louisiana law when exercising jurisdiction over a custody judgment of another state. *See Prater v. Prater*, 28807 (La.App. 2 Cir. 10/30/96), 682 So.2d 859; *Brummett v. Hudson*, 338 So.2d 124 (La.App. 1 Cir. 1976); and *Brewer v. Macaluso*, 221 So.2d 343 (La.App. 4 Cir. 1969).

We also note that Louisiana has enacted the Louisiana Child Custody Jurisdiction and Enforcement Act (UCCJEA), La.R.S. 13:1801-1842, for the

---

[9] The trial court went on to say that "even if 'best interest' is not the burden, the Court also believes the mover proved 'material change in circumstances affecting the child's welfare' since the previous orders." However, the trial court made no specific findings concerning these material changes of circumstances.

purpose of addressing jurisdictional issues involving child custody matters. With

regard to considering modification of custody determinations of other states,

La.R.S. 13:1815 provides:

> Except as otherwise provided in R.S. 13:1816,[10] a court of this state may not modify a child custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under R.S. 13:1813(A)(1) or (2) and:
>
> (1)  The court of the other state determines it no longer has exclusive, continuing jurisdiction under R.S. 13:1814 or that a court of this state would be a more convenient forum under R.S. 13:1819; or
>
> (2)  A court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

Louisiana Revised Statutes 13:1813(A)(1) and (2), as referenced in La.R.S.

13:1815, read as follows:

> A.  Except as otherwise provided in R.S. 13:1816, a court of this state has jurisdiction to make an initial child custody determination only if:
>
> (1)  This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state, or had been the child's home state within twelve months before commencement of the proceeding and the child is absent from the state because he was required to leave or was evacuated due to an emergency or disaster declared under the provisions of R.S. 29:721 et seq., or declared by federal authority, and for an unforeseen reason resulting from the effects of such emergency or disaster was unable to return to this state for an extended period of time.
>
> (2)  A court of another state does not have jurisdiction or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under R.S. 13:1819 or 1820, and
>
> (a)  The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.

---

[10] Louisiana Revised Statutes 13:1816 addresses temporary emergency jurisdiction situations and is not applicable to the matter before us.

(b) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.

We find that when the trial court obtained jurisdiction in this matter, its legal power and authority to hear and determine the issue before it was not limited. Therefore, Louisiana law, and not Nevada law, applied to the custody dispute. Accordingly, we find the trial court's failure to apply Louisiana law to be legal error which interdicted the fact-finding process and which requires that we review this matter *de novo*. *Evans*, 708 So.2d 731.

### *De Novo Review under Louisiana Law*

In performing a *de novo* review, we first note that the litigants agree that the July 9, 2008 judgment and the July 21, 2010 order were not "considered decree[s]" subject to the "heavy burden" requirement of *Bergeron v. Bergeron*, 492 So.2d 1193 (La.1986). A decree only becomes a considered decree when the trial court receives and considers evidence relating to "parental fitness to exercise care, custody, and control" of a child. *Major v. Major*, 02-2131, p. 7 (La.App. 1 Cir. 2/14/03), 849 So.2d 547, 551. That being the case, Mr. Stone's burden of proof was to show that a material change of circumstances occurred since the judgment and order were entered, and that his proposed modification of that judgment was in Teaci's best interest. *Hensgens v. Hensgens*, 94-1200 (La.App. 3 Cir. 3/15/95), 653 So.2d 48, *writ denied*, 95-1488 (La. 9/22/95), 660 So.2d 478.

Absent any authority supporting his argument that Nevada law precludes his need to prove a material change of circumstances, Mr. Stone still suggests that, regardless of the trial court's error in applying Nevada law, the record contains at least nine material changes of circumstance justifying the trial court's best interest finding:

(1) Rozetta Mizell's marriage to a convicted drug dealer; (2) Rozetta Mizell's relocation from Alaska to Louisiana in violation of the Nevada Judgment with consent; (3) Rozetta Mizell's diagnosis of PTSD in 2011; (4) Rozetta Mizell's medical retirement from the military in 2011; (5) Rozetta Mizell's inability to properly parent the child as indicated by Dr. John Simoneaux in his evaluation on May 21, 2013 by his observation at his office; (6) Rozetta Mizell's continued manic periods of time related to her failure to maintain her medication for her Bi-Polar II condition during her periods of heavy drinking; (7) Rozetta Mizell's continued problems with her Bipolar II condition; (8) The minor child became of school age; and (9) The development of a strong sibling relationship between Teaci Mizell-Stone and her brothers Bryson Stone and Hayden Stone.

This court finds that some of these assertions are not supported by the evidentiary record, and the remaining factual assertions constitute life changes that do not rise to the level of material changes of circumstance. As noted by Judge Weimer in his concurring opinion in *Shaffer v. Shaffer*, 00-1251, p. 2[11] (La.App. 1 Cir. 9/13/00), 808 So.2d 354, 360, (Weimer, J., concurring), *writ denied*, 00-2838 (La. 11/13/00), 774 So.2d 151, "[l]ife changes may occur, but if the changes do not have an effect on the welfare of the child, then no change in custody is justified."

***Rozetta Mizell's marriage to Roy Mancil***

The record does establish that Mr. Mancil has a felony criminal record dating back to 2003, and that he served a prison sentence for his criminal activity. However, nothing in the record suggests that he has reverted to his criminal ways. In fact, the record establishes just the opposite. By the time Mr. Mancil began dating Ms. Mizell, he not only had served his time for his criminal offenses, but the record suggests that he had become a productive member of society; which is our hope for everyone released from prison. Mr. Mancil was gainfully employed by the same company for five years prior to the trial in this matter, had risen to a management position within the company, and was supervising approximately sixty employees for his employer. Furthermore, nothing before or after his August

---

[11] Found on page 2 of the concurrence.

13

4, 2012 marriage to Ms. Mizell suggests that he has been anything less than an upstanding step-father to Teaci.

While a step-parent's criminal past is not something that any court should ignore, it should be considered in relation to its effect on the minor child at issue in the litigation. In making that consideration in this case, we will not punish Mr. Mancil, and by extension Ms. Mizell, for his past criminal record, absent any evidence of a negative effect on Teaci. While the marriage itself is a change of circumstances, it is not a material change of circumstances that would satisfy Mr. Stone's burden of proof on that issue.

### *Rozetta Mizell's relocation from Alaska to Louisiana*

Mr. Stone asserts that Ms. Mizell violated the July 21, 2010 custody order by moving from Alaska to Louisiana in March of 2012, and that this constitutes a material change of circumstances. In making this argument, Mr. Stone relies on the fact that the order cited Nevada Revised Statutes 125C.200, which reads as follows:

> If custody has been established and the custodial parent intends to move his residence to a place outside of this state and to take the child with him, he must, as soon as possible and before the planned move, attempt to obtain the written consent of the noncustodial parent to move the child from this state.
>
> If the noncustodial parent refused to give that consent, the custodial parent shall, before he leaves this state with the child, petition the court for permission to move the child. The failure of a parent to comply with the provisions of this section may be considered as a factor if a change of custody is requested by the noncustodial parent.

The clear intent of this provision of Nevada law is to protect a noncustodial parent by procedurally preventing a custodial parent from removing a child from Nevada to the noncustodial parent's detriment. However, in making his argument, Mr. Stone ignores the fact that Ms. Mizell and Teaci were not living in Nevada at the

time of their move to Louisiana, and were not living in Nevada when the order was entered. They were living in Alaska by virtue of Ms. Mizell's military transfer. Additionally, the Nevada statute suggests that her failure to seek permission to leave Nevada "may be considered as a factor if a change of custody is requested by the noncustodial parent." Thus, in this case, the statute does not apply to the factual situation before us. In fact, were it to apply, and were we to consider the permissive language of the statute to consider her return to Louisiana as a material change of circumstances, such a change would be to the benefit of Mr. Stone, in that his daughter is now thousands of miles closer to him. Thus, we decline to construe this as a material change of circumstances sufficient to satisfy Mr. Stone's burden of proof on this issue.

### *Rozetta Mizell's Diagnosis of PTSD and her Medical Retirement*

Mr. Stone suggests that either, or both, of these events constituted a material change of circumstances. We find no merit in either of these arguments as well.

Mr. Stone testified that during his eight-month relationship with Ms. Mizell, he was aware that she had already been tentatively diagnosed as suffering from Bipolar II Disorder and depression. This became a recognized diagnosis after she arrived in Alaska, and in May of 2011, her military treating physicians added the diagnosis of PTSD. Despite the presence of these disabilities, the military medical records from Alaska reveal that as a patient, she was found to be well groomed and properly in uniform, friendly and cooperative, alert and oriented, spontaneous in speech, coherent, linear, logical, goal directed, and with no thoughts of doing harm to others. The physician found her judgment to be intact, and the only risk factor to be her geographical isolation from her family.

Ms. Mizell's medical difficulties were known to Mr. Stone, were present at Teaci's birth, and have not significantly changed. Mr. Stone has introduced no

evidence to establish a change of material circumstances in this regard. In fact, Dr. Simoneaux testified that a mental illness diagnosis, in and of itself, is not sufficient to find a parent unfit, and he even questioned the accuracy of Ms. Mizell's PTSD diagnosis. Therefore, we find no merit in his argument on these two issues.

*Rozetta Mizell's Parental Discipline Shortcomings*

Mr. Stone bases this argument totally on the limited time Ms. Mizell and Teaci were observed by Dr. Simoneaux on May 21, 2013. In that window of opportunity, Dr. Simoneaux commented that Ms. Mizell and her husband allowed Teaci to substantially clutter his waiting room as he was interviewing Ms. Mizell. Ms. Mizell acknowledged that Teaci, and the children of another party being interviewed that day, did put Dr. Simoneaux's waiting room in disarray, but testified that she, Teaci, and her husband cleaned up the "mess" before they left. Without more, we decline to find that this one incident rises to the level of a material change of circumstances needed to satisfy Mr. Stone's burden of proof on this issue.

*Rozetta Mizell's General Health, Medication Issues, and Drinking Issues*

Mr. Stone alleges that Ms. Mizell does not take her medication while drinking alcohol which has led to manic periods caused by her Bipolar II Disorder, and that this constitutes a material change of circumstances. His only evidence for this argument comes from Facebook postings he captured from Ms. Mizell's account three years before the March 28, 2014 hearing. However, there is nothing in these Facebook postings that would suggest Ms. Mizell was not taking her Bipolar II medication, and the conclusions drawn by Mr. Stone from the postings constitute his interpretation of what was occurring at the time. Ms. Mizell testified that many of the postings on her accounts, and the comments thereon, were made by others or were taken out of context by Mr. Stone. While acknowledging that

she had consumed alcoholic beverages in the past, she testified that she knew how to control the mix of alcohol and her medication in order to avoid any adverse reaction caused by the combination of the two. We note that the age of the postings relied upon, as well as Mr. Stone's personal experience with Ms. Mizell during their relationship, reflects no material change of circumstances he can rely on at this time. In fact, all of the evidence presented is that Ms. Mizell has moved past that stage of her life.

In addition to asserting Ms. Mizell's alleged alcohol and medication problems, Mr. Stone also argues that Ms. Mizell continues to have problems with her Bipolar II Disorder, to the extent that this constitutes a material change in circumstances. He cites the court to *Mendoza v. Mendoza*, 11-113 (La.App 5 Cir. 12/13/11), 82 So.3d 411, to support his allegation that a diagnosis of bipolar disorder amounts to a material change of circumstances. In *Mendoza*, the mother was ordered to "submit to a mental health evaluation" by a consent judgment. *Id.* at 415. The record is unclear, but it does not appear that the mother in *Mendoza* had previously been diagnosed with bipolar disorder. The fifth circuit ultimately upheld the trial court's finding that there was a material change of circumstances, and that it would be in the best interests of the children that custody be changed to the father. *Id.* However, it appears that all of the evidence supporting this finding was based upon the manic tendencies and paranoia that the mother experienced because of her bipolar disorder, not the fact of the disorder itself. *Id.*

The matter before us is distinguishable from *Mendoza*, in that Ms. Mizell's Bipolar II Disorder predated her sexual relationship with Mr. Stone, and he has offered no evidence to support a finding that her disorder has worsened. Further, *Mendoza* does not support the position that worsened bipolar disorder is a material change in circumstances, as it was the mother's manic tendencies and paranoia that

17

resulted in the behavior the court found persuasive. *Id.* Thus, we find no merit in this argument.

### *Teaci's Beginning School*

In making this argument, Mr. Stone cites this court to *Bingham v. Bingham*, 42,140 (La.App. 2 Cir. 4/4/07), 954 So.2d 842, and *Shaffer*, 808 So.2d 354, to support his allegation that Teaci's becoming of an age to attend school amounts to a material change in circumstances. In *Bingham*, "The parents agreed to shared custody with the mother having the two children from morning to evening and the father from evening to morning." *Bingham*, 954 So.2d at 843. When the children started school, the father found the daily custody schedule unworkable, and the parties agreed to move to a weekly exchange rather than a daily exchange. *Id.* The court ultimately found that "there is no permanent, court-sanctioned custody plan and that this case is in the posture of an initial custody determination where proof of a change in circumstance is not required." *Id.* at 844. Therefore, *Bingham* is distinguishable from the instant case because it did not involve a consent decree. Thus, the mother was not required to prove a material change in circumstances and that the modification of custody was in the best interest of the child.

While Mr. Stone is correct that the court in *Shaffer* found there to be a material change in circumstances, the facts are distinguishable from the instant case as well. In *Shaffer*, the non-domiciliary parent was granted custodial visitation with the minor child for the "first full week of each calendar month[.]" *Shaffer*, 808 So.2d at 356. The domiciliary parent lived in Lafayette, Louisiana, and the non-domiciliary parent lived in Baton Rouge, Louisiana. *Id.* The parties separated when the child was less than three months old and entered into the stipulated custody judgment when the child was less than nine months old. *Id.* The non-domiciliary parent filed a motion requesting to be named the child's

domiciliary parent shortly before her fourth birthday. *Id*. The court found that the non-domiciliary parent had proven "a change in circumstances materially affecting [the child's] welfare by showing that she had reached school age" and she needed to attend school in one location, which required modification of the custody decree. *Id*. at 358. The current case can be distinguished from *Shaffer* because the July 21, 2010 Nevada custody order contemplated Teaci becoming of school age and planned for the custody schedule to be adjusted at that time. Therefore, there is no material change in circumstances requiring the modification of custody in this case, based on an unworkable custody schedule from Teaci's enrollment in school forward, as seen in *Shaffer*.

### *The need for a strong sibling relationship between Teaci and her step-brothers*

Mr. Stone alleges that the development of a relationship between Teaci and his two sons, Bryson and Hayden, amounts to a material change of circumstances. In support of this argument, he directs this court to *Howze v. Howze*, 99-852 (La. 5/26/99), 735 So.2d 619, and *Sanders v. Sanders*, 05-803 (La.App. 1 Cir. 9/23/05), 923 So.2d 721. However, in both of these cases, the courts had already moved past the material change of circumstances issue and were addressing the child's best interest when considering the sibling relationship. Thus, we find them to be inapplicable to the material change of circumstances issue before the court, and we find no merit in Mr. Stone's argument in this respect.

### DISPOSITION

For the foregoing reasons, we reverse the trial court judgment removing Rozetta Mizell as the domiciliary custodian of the minor child, Teaci Trinity Berlin Stone-Mizell, and naming Juston Stone to that position. We render judgment reinstating Rozetta Mizell as the domiciliary custodian of the minor child and assess all costs of these proceedings, at the trial level and on appeal, to Juston

Stone.

**REVERSED AND RENDERED.**

ROZETTA MIZELL

VERSUS

JUSTON STONE


**GREMILLION, Judge, concurring.**


Although I concur in the result reached by the majority in finding that the change of domiciliary custody from Mizell to Stone was erroneous, I do not agree that Stone failed to prove that numerous material changes occurred in this case. Although there seems to be a lack of clarity as to the meaning of "material change of circumstances," I find that in a case involving a consent decree, rather than a considered one, the moving party's burden should not be extended to include a showing of how the material changes *affect the child's welfare*. In *McCorvey v. McCorvey*, 05-174, p.19 (La.App. 3 Cir. 11/2/05), 916 So.2d 357, 370-371, *writ denied*, 05-2577 (La. 5/5/06), 927 So.3d 300, a panel of this court made this distinction:

> "When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child." *Bergeron v. Bergeron,* 492 So.2d 1193, 1200 (La.1986). Also, "there must be a showing of a change in circumstances materially affecting the welfare of the child before the court may consider making a *significant* change in the custody order." *Id.* at 1194 (emphasis added).

However, "[i]n cases where the original custody decree is a stipulated judgment, such as when the parties consent to a custodial arrangement, and no evidence of parental *fitness* is taken, the heavy burden of proof enunciated in *Bergeron* in inapplicable." *Aucoin*, 834 So.2d at 1248 (emphasis added), *Hensgens v. Hensgens,* 94-1200, pp. 6-7 (La.App. 3 Cir.), 653 So.2d 48, 52, *writ denied*, 95-1488 (La. 9/22/95), 660 So.2d 478. *See also, Evans,* 708 So.2d 731. Where the *Bergeron* burden is inapplicable the party seeking to modify the custody arrangement need only prove a change in circumstances since the original decree and prove that the new custody arrangement would be in the best interest of the child. *Aucoin*, 834 So.2d 1245; *See also, Weaver v. Weaver*, 01-1656 (La.App. 3 Cir. 5/29/02), 824 So.2d 438; *Hensgens*, 653 So.2d 48; *Evans*, 708 So.2d 731.

In *Shaffer*, the case cited by the majority, the same lesser standard was applied, and the appellate court found that the child's becoming of school age was a material change in circumstances. Justice Weimer, in his concurrence, essentially stated that the change in circumstance must materially affect the welfare of the child.

I agree with Stone that substantial material changes in circumstances have occurred since the 2010 consent judgment, including cross-country moves, significant employment status changes, marriage status changes, and lifestyle changes. The combination of all these significant life changes easily meets the change-in-circumstances requirement. The majority claims that some of these changes are "life changes that do not rise to the level of material changes of circumstances." I do not agree. The concurrence of this many "life" changes, would necessarily impact a child's life. Moreover, Mizell's marriage to a three-time convicted felon, twice for distribution of methamphetamines, would be extremely significant to any non-domiciliary parent. Mizell and Mancil admitted that Mizell has a very hostile relationship with the mother of Mancil's young son, and that custody exchanges result in threats and police being called. None of this behavior depicts the tranquility envisioned by the majority.

Moreover, this court has found that material changes exist under lesser circumstances. In *Harvey v. Harvey*, 10-1338 (La.App. 3 Cir. 3/9/11), 2011 WL 803778 (an unpublished opinion), communication problems between the parties was affirmed as a material change in circumstance. In *Hebert v. Blanchard*, 97-550, p.5 (La.App. 3 Cir. 10/29/97), 702 So.2d 1102, 1105, the father had to prove "that a material change in circumstances has occurred and that the modification proposed is in the best interest of the children." There was no discussion of how the changes materially affected the children, because it could be inferred:

> We find no difficulty in concluding that Mr. Blanchard established numerous, material changes of circumstances. Since the divorce in February of 1990, he has remarried and has basically stabilized his life. To the contrary, Ms. Hebert's personal situation seems more complicated than that which existed at the time of the divorce. She has lived with three men to whom she was not married, has moved nine times since the separation, and has subjected her now school-age children to four separate school transfers.

*Id.*

Similarly, in this case, Stone proved a material change in his own circumstances in that he and his wife now have a stable, committed relationship focused on family. It is implicit that "life changes" of this magnitude will necessarily affect the child's welfare to some degree. Thus, in my view, once this step of the analysis has been satisfied, the only issue is whether changing the primary domiciliary status from Mizell to Stone is in the best interest of the child. Although I find it difficult to abandon the deference owed to the trial court in its factual determinations, I find that the change in domiciliary status was not in Teaci's best interest, primarily because Mizell had been her caregiver since birth, and Teaci's teacher testified that she was doing well in school and behaved at a socially acceptable level. Thus, I concur in the majority's ruling naming Rozetta Mizell the domiciliary custodian of the minor child.